UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Olga L. Bogdanov,
Trustee of Amherst
Technologies, LLC,
        Appellant/Cross-Appellee

        v.                          Case No. 10-cv-543-SM
                                    Opinion No. 2011 DNH 153
Avnet, Inc.,
        Appellee/Cross-Appellant


**O R D E R**


        The Trustee in this adversary proceeding seeks to avoid
preferential payments made to Avnet, Inc., Amherst's largest
unsecured creditor.  The matter was tried in the bankruptcy
court, which held that Avnet established a subsequent new value
defense under 11 U.S.C. § 547(c)(4), thereby substantially
limiting the Trustee's recovery of preferential payments.  The
Trustee appeals and Avnet cross-appeals.[1]


**Standard of Review**

        Jurisdiction over appeals from final judgments, orders, and
decrees issued by the bankruptcy court lies in this court.  28
U.S.C. § 158(a).  The bankruptcy court's legal determinations are

---

[1]     Avnet's cross-appeal is best described as a "conditional"
cross-appeal.  Avnet seeks affirmance of the bankruptcy court's
decision, and requests consideration of its cross-appeal — in
which it contests the bankruptcy court's rejection of Avnet's
"ordinary course of business defense" under § 547(c)(2) — only if
the court finds merit in the Trustee's appeal.

reviewed de novo.  See, e.g., Dahar v. Jackson (In re Jackson),
459 F.3d 117, 121 (1st Cir. 2006); Askenaizer v. Seacoast Redimix
Concrete, LLC, Civil No. 06-cv-123-SM, 2007 WL 959612, at *1
(D.N.H. March 29, 2007).  But its findings of fact are accorded
deference and will not be disturbed unless clearly erroneous.
Groman v. Watman (In re Watman), 301 F.3d 3, 7 (1st Cir. 2002);
Brown v. Reifler, Civil No. 08-cv-272-SM, 2008 WL 4722987, at *1
(D.N.H. Oct. 23, 2008).  A factual finding "is 'clearly
erroneous' when although there is evidence to support it, the
reviewing court on the entire evidence is left with the definite
and firm conviction that a mistake has been committed."  Anderson
v. Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States
v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).


**Background**

I.   Transactions Between the Parties

     The basic facts are not seriously disputed.  Amherst was a
value-added reseller that provided information technology
services to its customers.  Avnet, a global distributor of
electronic products, supplied goods, primarily software and
computer components, to Amherst on an unsecured basis for over
nine years.


     Before the end of 2004, Amherst had generally been paying
Avnet's invoices within sixty days.  Because of a large number of

orders Amherst received, however, Avnet extended substantial additional credit to Amherst.  Thereafter, Avnet insisted that Amherst reduce its outstanding credit balances.  Over the course of a few months the parties employed various strategies to reduce Avnet's credit exposure, including a 2 for 1 payment arrangement under which Amherst paid Avnet $2 on account for every $1 of new product Avnet shipped.  The parties alternated between the 2 for 1 arrangement and a 1 for 1 arrangement several times during the first months of 2005.  As a result, "from late April through late June Amherst paid Avnet $1.92 for every $1.00 shipped." Memorandum Opinion, United States Bankruptcy Court, Adv. No. 07-1094-JMD (Deasy, J.) (document no. 5-1) at 6.  Amherst's payments through June 24 were applied to nearly 300 invoices, "all but nine [of which] were for invoices more than sixty days old."  Id.

In late June of 2005, Amherst ordered $4 million in software from Avnet to fill a large order it received from American Honda (the "Honda Order").  Avnet's credit managers "explored a number of options to finance the Honda Order," but when those options proved unavailable, "Avnet ultimately agreed to support the Honda Order" on a pre-payment basis.  Id. at 7.  By the time Avnet requested pre-payment, however, Amherst had already issued checks to pay, in large part, Avnet's outstanding invoices.  Amherst directed that $2.9 million be applied toward payment of those

3

outstanding invoices, and $1.1 million applied toward pre-payment of the Honda Order.  Id. at 14.

On July 1, 2005, Avnet shipped $4 million worth of software related to the Honda Order to Amherst.  On July 13, Amherst "wrote its last prepetition check to Avnet," in the amount of $400,202.13, as payment on the Honda Order.  Id. at 7.  Between April 20, 2005, and July 13, 2005, Amherst paid Avnet $8.1 million on outstanding invoices, and Avnet shipped goods worth over $7 million to Amherst, or to its customers on Amherst's behalf, on an unsecured basis.  Id. at 6.  On July 20, 2005, Amherst filed for bankruptcy protection.  Avnet claimed that it was owed over $5.3 million in unpaid invoices.  Id. at 7-8.

II.  The Bankruptcy Court's Decision

In July of 2007, the Trustee initiated this adversary proceeding against Avnet, seeking to avoid preferential payments made to Avnet during the ninety-day period preceding Amherst's bankruptcy petition.  Avnet asserted an "ordinary course of business" defense under 11 U.S.C. § 547(c)(2), and a "new value" defense under § 547(c)(4).  Following a two-day bench trial, the bankruptcy court issued its decision.  See Doc. No. 5-1. Although it rejected Avnet's ordinary course of business defense, the bankruptcy court credited Avnet's subsequent new value defense, which reduced Avnet's preference liability to $337,521.

4

On September 10, 2010, the bankruptcy court entered final
judgment in favor of the Trustee in that reduced amount.

In recognizing Avnet's subsequent new value defense as
valid, the bankruptcy court found that "Avnet provided new value
every time it shipped computer components and software to Amherst
and/or its customers during the preference period."  Doc. No. 5-1
at 12.  It also determined, as a matter of law, that new value
need not remain "unpaid" for the defense to apply "so long as any
transfer that paid for such new value is not unavoidable *but for*
§ 547(c)(4)."  Id. at 19 (emphasis added).  Finally, the
bankruptcy court found that $2.2 million in payments made on June
29 and 30 were not "made as part of a contemporaneous exchange
for new value in connection with the Honda Order" under §
547(c)(1), because, as a factual matter, neither Amherst nor
Avnet intended to make a contemporaneous exchange of money for
goods.  Id. at 19-21.

The Trustee appeals the bankruptcy court's conclusions and
says she is entitled to recover over $4 million in avoidable
preference payments, rather than the $337,521 allowed by the
bankruptcy court.

**Discussion**

I.   <u>New Value Defense Generally</u>

Payments by a debtor to a creditor "for or on account of an antecedent debt" made during the ninety days immediately preceding the filing of a bankruptcy petition (and that meet other criteria) are preferential transfers or "preferences." 11 U.S.C. § 547(b).  "In unofficial and general terms, a preference is 'a transfer of the debtor's property on the eve of bankruptcy to satisfy an old debt.'"  Epstein, Nickles & White, <u>Bankruptcy, Practitioner Treatise Series</u>, Vol. 1, §6-3, at 509 (1992) (quoting Orelup, <u>Avoidance of Preferential Transfers Under the Bankruptcy Reform Act of 1978</u>, 65 Iowa L. Rev. 209 (1979)).

Preferences may be avoidable (<u>i.e.</u>, voidable) by the trustee.  11 U.S.C. § 547(b).  If a preference is avoided, "the trustee may recover, for the benefit of the estate, the property transferred . . ."  11 U.S.C. § 550(a).  Avoiding preferences generally puts creditors on equal footing with each other for the purpose of distributing the debtor's estate, and discourages "creditors from hastily forcing troubled businesses into bankruptcy."  <u>Lawson v. Ford Motor Co.</u>, 78 F.3d 30, 40 (2d Cir. 1996).

Section § 547(c), however, provides some exceptions, or defenses, designed to prevent avoidance of preferences under some

6

circumstances.  Those exceptions "are designed to rescue from attack in bankruptcy those kinds of transactions, otherwise fitting the definition of a preference, that are essential to commercial reality and do not offend the purposes of preference law, or that benefit the ongoing business by helping to keep the potential bankrupt afloat."  Epstein, et al., Bankruptcy § 6-22 at 587 (quotation omitted).

Section 547(c) provides, in relevant part, that the trustee may not avoid a transfer that (1) was "intended by the debtor and the creditor . . . to be a contemporaneous exchange for new value given to the debtor" and "in fact" was a "substantially contemporaneous exchange" ("contemporaneous exchange defense"), 11 U.S.C. § 547(c)(1); (2) was "in payment of a debt incurred by the debtor in the ordinary course of business" ("ordinary course of business defense"), 11 U.S.C. § 547(c)(2); or (3) was followed in time by "new value" given by the creditor "to or for the value of the debtor" ("subsequent new value defense"), 11 U.S.C. § 547(c)(4).

Under the subsequent new value defense, § 547(c)(4), a creditor will escape preference liability to the extent it provides new value after the debtor made a preference transfer to the creditor.  In re JKJ Chevrolet, Inc., 412 F.3d 545, 552 (4th Cir. 2005).  The rationale for protecting the creditor is

7

straightforward — "the creditor's provision of the subsequent goods or services has replenished the estate." In re Bridge Info. Sys., Inc., 287 B.R. 258, 266 (E.D. Mo. 2002). The exception serves the important public policy of "encourag[ing] creditors to continue to do business with financially troubled debtors, with an eye toward avoiding bankruptcy altogether." In re IRFM, Inc., 52 F.3d 228, 232 (9th Cir. 1995). In particular, it promotes the continuation of revolving credit relationships, whereby new value is continually being advanced to the debtor after payment of old debt. See In re Pillowtex Corp., 416 B.R. 123, 131 (D. Del. 2009).

On the other hand, the subsequent new value defense will not apply if the creditor, who has the burden of proof, Howard v. Bangor Hydro Elec. Co., 324 B.R. 164, 168 (Bankr. D. Me. 2005), does not establish that "the debtor did not make an otherwise unavoidable transfer" "on account of" the new value. 11 U.S.C. § 547(c)(4)(B). The double negatives are unnecessarily complicated, but, essentially, the creditor must show that the debtor did not later pay for the new value with an "otherwise unavoidable transfer." Id. That is, the creditor cannot both shield a prior preference payment by offsetting it with subsequent new value, and also keep a subsequent preferential payment for the new value under some other defense (e.g., contemporaneous exchange).

8

II.   <u>The Meaning of "Otherwise Unavoidable"</u>

It is undisputed that Amherst made preferential payments to Avnet from April through the end of June, 2005 (referred to as "P1").  As noted, the bankruptcy court found that, during that period, Avnet advanced $2.2 million worth of goods, comprising "subsequent new value" (referred to as "NV1").  It is also undisputed that on June 29 and 30 Amherst paid $2.9 million ("P2") on invoices for previous shipments of goods, including goods provided as NV1.  In other words, NV1 was subsequently "paid" for by P2.  The bankruptcy court nevertheless allowed NV1 to offset $2.2 million of P1, and further allowed NV2 (the Honda new value) to offset P2, such that the Trustee was not permitted to avoid, and Avnet was not required to return, either P1 or P2.

It is generally accepted that a creditor's advance of new value may offset a prior preference where the debtor did not later pay the creditor for the new value (<u>i.e.</u>, the subsequent new value remains "unpaid").  <u>See</u> <u>Matter of Kroh Bros. Dev. Co.</u>, 930 F.2d 648, 652 (8th Cir. 1991) (surveying cases).  Unpaid new value "in effect returns the preference to the estate."  <u>Id</u>. (quotation omitted).  The issue presented in this case is whether a creditor can offset a prior preference with subsequent new value that is later paid for, and if so, under what circumstances.

The Court of Appeals for this circuit has yet to address the
issue.  Absent the benefit of controlling circuit precedent, the
bankruptcy court ruled that new value need not "remain unpaid,"
as a condition of offsetting it against a prior preference, and
described the circumstances under which the statute permits new
value to offset prior preference payments, even if the
concomitant debt is later paid.  Those legal determinations are
reviewed de novo.  See Dahar, 459 F.3d at 121.


A.   Must New Value Remain Unpaid?

The bankruptcy court ruled that "the new value defense is
not barred altogether anytime new value is repaid."  Doc. No. 5-1
at 18 (citing IRFM, 52 F.3d at 231).  Looking to "the plain
language of the statute," the court found that "'section
547(c)(4) does not contain any language that even suggests that
the new value . . . is somehow to be limited to unpaid
invoices.'"  Id. at 17 (quoting Valley Candle Mfg. Co. v.
Stonitsch, 39 B.R. 645, 653 (Bankr. W.D. Mo. 1984)).


The Trustee challenges that ruling, arguing that only new
value that "remains unpaid" can be used to offset a prior
preference.  Fairness to the other creditors, she contends,
requires that a creditor not keep a preferential transfer unless
that creditor comparably "enriched" the estate with goods or
services after the transfer, i.e., where it gave additional value

10

to the estate without obtaining reimbursement.  Although some courts have held that new value must "remain unpaid" (<u>see e.g.</u>, <u>New York City Shoes, Inc. v. Bentley Int'l, Inc.</u>, 880 F.2d 679, 680 (3d Cir. 1989); <u>In the matter of Prescott</u>, 805 F.2d 719, 728 (7th Cir. 1986); <u>In re Jet Florida Sys.</u>, 841 F.2d 1082, 1083-84 (11th Cir. 1988)), the better view is the one adopted by the bankruptcy court in this case.

"Where a statute is clear on its face the plain meaning of its language should be applied."  <u>In re Check Reporting Svcs.</u>, 140 B.R. 425, 434 (Bkrtcy. W.D. Mich. 1992) (citing <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 242 (1989).  On its face, Section 547(c)(4) clearly, though conditionally, allows new value to be paid: the statute anticipates transfers made "on account of . . . new value," and requires that any such payment be "not . . . otherwise unavoidable."  11 U.S.C. § 547(c)(4).  As the bankruptcy court noted, "not . . . otherwise unavoidable" generally means "otherwise avoidable."  Doc. No. 5-1 at 18 (quotation omitted).  Given the words used in the statute, offsetting new value may be paid so long as the payment is "otherwise avoidable" by the trustee.  The double-negative adds frustrating complexity to the condition's description, but the statute is unambiguous in allowing new value to be paid so long as the "otherwise avoidable" condition is met.  <u>See</u> <u>Matter of Toyota of Jefferson, Inc.</u>, 14 F.3d 1088, 1092 (5th Cir. 1994)

11

("plain language" of the statute allows new value to be "paid" under prescribed circumstances); In re IRFM, Inc., 52 F.3d 228, 231 (9th Cir. 1995) (same); see also 4 Norton Bankr. L. & Prac. 3d § 66:36 & n.25 (same, collecting cases) ("The focus of the inquiry is on the avoidability of the debtor's subsequent payments, and not on whether the new value remains unpaid.")

Furthermore, common sense and principles of fairness underlie the statutory language.  As the court in In re Check Reporting noted:

> [A] creditor should not be able to assert a new value transfer as a defense to a preference if the transfer was paid for by the debtor because the estate was not made whole by the new value transfer.  But, . . . by the same token, the trustee should not be able to assert the new value was paid if the trustee is asserting that the paying transaction was in fact a preference which the trustee can avoid.

In re Check Reporting, 140 B.R. at 433.  Put another way, "[t]here is no logical reason to distinguish between a creditor that was paid by an avoidable transfer and one that was never paid at all.  At the end of the day, in both cases, the creditor has been wholly uncompensated for his new value."  In re Maxwell Newspapers, 192 B.R. 633, 639 (S.D.N.Y. 1996).

The bankruptcy court correctly ruled, as a matter of law, that the subsequent new value defense does not require that the subsequent new value remain unpaid, but does require that the

12

preference payment be avoidable ("not otherwise unavoidable"), so
accessible to the Trustee for replenishing the estate.  The court
concurs in, and adopts, the reasoning of <u>In re Check Reporting</u>.
140 B.R. at 431-37.


     B.   <u>Under What Circumstances May New Value Be Paid?</u>

     The bankruptcy court determined that new value may be paid
when the payment is not protected from avoidance under any theory
<u>other</u> <u>than</u> a § 547(c)(4) (new value) defense.  Doc. No. 5-1 at
19.  The court interpreted "otherwise" as referring "to all
theories of avoidability other than §547(c)(4)."  <u>Id</u>.  That is,
the bankruptcy court determined that a payment for previously
advanced new value will disqualify the new value from offsetting
a prior preference when the payment is unavoidable under defenses
such as the "contemporaneous exchange," or "ordinary course of
business" defenses.  However, where a payment for new value is
unavoidable only because the "subsequent new value" defense
applies (new value was later given) (§ 547(c)(4)), it will not
disqualify the new value from offsetting a prior preference.  The
bankruptcy court explained:

> [S]ubsequent shipments by a creditor, which enlarge the
> debtor's estate, are defenses to a trustee's preference
> recovery even if the debtor has later paid for those
> shipments, which reduces the debtor's estate, if the
> repayment of the subsequent new value would itself be
> avoidable and recoverable as a preference by the debtor
> <u>but for</u> the application of the new value defense.

Doc. No. 5-1 at 18 (emphasis added).  In short, the bankruptcy court allowed "subsequent new value . . . [to] offset a transfer that pays a previously advanced new value."  Id.  The Trustee claims error in that regard, arguing that "otherwise" refers to *all* defenses to avoidability, including a subsequent new value defense.  That is, the Trustee says payment for new value that has been used to offset a prior preference must not be shielded from the Trustee's reach by any defense, including a § 547 (c)(4) defense.  The creditor "must concede . . . [P2's] avoidability for all purposes."  Doc. No. 5-1 at 19 (discussing Trustee's position).

"As in any statutory interpretation case, we start with the text of the statute."  In re BankVest Capital Corp., 360 F.3d 291, 296 (1st Cir. 2004).  Here, the word "otherwise" is somewhat ambiguous "because it remains unclear, strictly as a matter of linguistics" what "the term . . . is referring [to]." *Preferential Transfers, the Subsequent New Value Defense, and the Requirement That the New Value 'Remain Unpaid' (or Not)*, 30 No. 2 Bankr. L. Ltr. (Feb. 2010).  The bankruptcy court plausibly concluded that "otherwise" should be construed as referring to all defenses to avoidability other than the subsequent new value defense described in § 547(c)(4).  But, the Trustee's argument that "otherwise" refers to <u>all</u> defenses to avoidability is not implausible.  <u>See</u> <u>generally</u> <u>id</u>. (discussing differing

14

interpretations of "otherwise").  As noted in <u>In re BankVest</u>,
"[i]f the plain language of the Bankruptcy Code required either
of these interpretations, that would end the matter . . . .  But
[there is] . . . no textual basis for preferring appellants'
interpretation to the one adopted by the bankruptcy court, which
[is] . . . equally consistent with the text.  Nothing in the
language or syntax of [the statute] unambiguously requires either
outcome."  <u>In re BankVest</u>, 360 F.3d at 297 (citation omitted).
Policies underlying the subsequent new value defense, however,
provide solid support for the interpretation adopted by the
bankruptcy court here.

Three cases touch on the issue, but none directly resolves
it.  In <u>In re Check Reporting</u>, 140 B.R. at 439, the court
provided an exhaustive analysis of the subsequent new value
defense, which included a hypothetical example relevant to the
issue presented here.  <u>See id</u>. (hypothetical no. 6).  In
discussing the hypothetical, the court noted, albeit in <u>dicta</u>,
that transfers "unavoidable solely because of § 547(c)(4)" are
not "otherwise unavoidable" and do "not decrease the amount of
new value . . . which may be asserted by the creditor."  <u>Id</u>.  In
<u>In re Roberds</u>, 315 B.R. 443, 574 (Bankr. S.D. Ohio 2004), the
court, without directly addressing the issue, allowed subsequent
new value to offset a preference that paid for previously
extended new value.  <u>Id</u>.  And, in <u>IRFM</u>, 52 F.3d at 232-33, the

15

Ninth Circuit, without discussion of the precise issue presented here, found as "correct" a preference analysis that allowed subsequent new value to offset a transfer that paid a previously advanced new value.  Id.


The approach tacitly adopted by the Roberds and IRFM courts, and expressly adopted by the bankruptcy court in this case, better promotes the important policies underlying the subsequent new value defense than does the approach advocated by the Trustee.  Given the ambiguous use of the word "otherwise," consideration of both underlying policies and the statute's purpose is appropriate in construing the term.  See In re BankVest, 360 F.3d at 298 ("[T]he Code as written is ambiguous, so we must divine Congress's intent from other sources) (citing In re Weinstein, 272 F.3d 39, 48 (1st Cir. 2001) (where the Bankruptcy Code is ambiguous, courts look to "its historical context, its legislative history, and the underlying policies that animate its provisions")).


From one perspective, the bankruptcy court's approach might appear to be contrary to the policy favoring equality of treatment among creditors: the creditor who advances subsequent new value arguably receives a "double dip" because the creditor ends up keeping both P1 and P2.  But the bankruptcy court's approach serves critical values underlying the defense itself:

16

(1) providing foundering debtors an opportunity to work their way
back to solvency that they otherwise would not have, by
encouraging continued extension of risky credit, see In re
Pillowtex Corp., 416 B.R. at 130-31, and (2) "treat[ing] fairly"
those creditors who continue to extend credit to the debtor, by
preventing an "increas[e] [in their] bankruptcy loss." Id.
(quotation omitted).

By substantially reducing the risk assumed by creditors
willing to continue to do business with a struggling debtor, the
bankruptcy court's construction encourages creditors to stay in
the game, thus, in turn, reducing the debtor's risk of
bankruptcy, and the associated harm likely to be visited upon all
creditors by the debtor's business failure. See IRFM, 52 F.3d at
232. From a broad policy perspective, then, the approach stands
to help all creditors, even those who choose to step to the
sidelines. It is only from a post-petition perspective, when
efforts to stave-off bankruptcy have proven unsuccessful, that
the bankruptcy court's interpretation seems to prejudice other
creditors.

In addition, while the bankruptcy court's construction
reduces the risk for a creditor who continues to do business with
the debtor, it also requires something affirmative and reciprocal
from the creditor that decidedly benefits the estate. A creditor

17

who wishes to offset a transfer that paid a previously advanced
new value must advance yet additional new value, and, if that
second extension of new value is paid, must advance yet more new
value or risk having the last payment avoided in the event of
bankruptcy.  In other words, the risk to the creditor of
continuing to do business with a struggling debtor is reduced,
but that risk reduction depends upon the creditor continually
replenishing the estate with something of value, such as goods or
services, all to the benefit of both the struggling debtor and
its other creditors.  At bottom, that is a fair result.

The bankruptcy court's interpretation is consistent with the
better view, promotes the statutory purposes underlying the
defense, and the benefit to the estate outweighs any potential
unfairness to other creditors.  The bankruptcy court did not err
as a matter of law in ruling that, in this case, subsequent new
value may offset a transfer that paid a previously advanced new
value debt, so long as that transfer is "not otherwise
unavoidable."

C.    Contemporaneous Exchange

Seeking a different way around the bankruptcy court's
interpretation, the Trustee argues, alternatively, that Amherst's
payments to Avnet on June 29 and 30 are "otherwise unavoidable"
under the contemporaneous exchange defense described in

18

§ 547(c)(1).  Accordingly, she says, the new value advanced by
Avent (NV1) cannot be used to offset a prior preferential payment
(P1).  She argues that, although the June 29 and 30 payments were
applied to outstanding invoices for antecedent debt, the parties
<u>intended</u> the payments to be contemporaneously exchanged for the
Honda software, and that they were so exchanged.  If the Trustee
is right, then, under the bankruptcy court's construction of the
subsequent new value defense, those payments are indeed
"otherwise unavoidable."  As such, they would be protected from
the Trustee's reach for reasons other than the "subsequent new
value" defense, and, the consequence would be disqualification of
the prior new value, NV1, as an offset against the payments made
to Avnet from April through near the end of June (P1).

    Under the contemporaneous exchange defense, § 547(c)(1):

    (c)  The trustee may not avoid under this section a
    transfer —

    (1)  to the extent that such transfer was —

    (a)  intended by the debtor and the creditor to or for
    whose benefit such transfer was made to be a
    contemporaneous exchange for new value given to the
    debtor; and

    (b)  in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1).


    "The critical inquiry in determining whether there has been
a contemporaneous exchange for new value is whether the parties

19

intended such an exchange." <u>McClendon v. Cal-Wood Door</u>, 711 F.2d 122, 124 (9th Cir. 1983).  In determining the parties' intent, the bankruptcy court noted that Amherst "directed" that $2.9 million of the $4 million it paid on June 29 and 30 be applied to "receivables other than the Honda Order."  Doc. No. 5-1 at 20. The bankruptcy court noted as well that "'a vendor who conditions continued deliveries to the buyer on the buyer's payment of old invoices will not be protected by section 547(c)(1) from attack by the buyer's trustee, even though the buyer's payment to the vendor and the vendor's transfer of property to the buyer occurred contemporaneously.'"  <u>Id</u>. (quoting 5 <u>Collier on Bankruptcy</u> ¶ 547.04[1][a], at 547-47 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2009)).  Under such circumstances, the parties do not, as required by § 547(c)(1), "actually intend […] the exchange to be contemporaneous."  <u>Id</u>.

In this case, the debtor plainly directed that a substantial portion of the payment be applied to old invoices for antecedent debt.  The creditor obliged and the debt arising from the Honda Order remained largely unpaid.  Finding, as a factual matter, that "Amherst intended the payments to cover prior transactions," the bankruptcy court necessarily concluded that the requisite intent (that the debtor and creditor intended the transfer to be a contemporaneous exchange) was absent, so no contemporaneous exchange as defined by the statute occurred.  <u>Id</u>. at 20-21.  I

discern no basis in this record to question that finding of fact.
Certainly nothing in this record gives rise to a definite and
firm conviction that a mistake has been made with respect to the
bankruptcy court's factual determination of the debtor's intent.

The Trustee does not challenge the underlying facts, but
says the bankruptcy court erred as a matter of law in limiting
its intent inquiry to Amherst's direction to credit its payment
to past invoices.  The court should have, she says, focused on
whether the parties intended to exchange payments (regardless of
how they were to be applied) for new value.  Since it was
understood that Avnet would not ship the Honda goods until
Amherst transferred $4 million, the Trustee argues that §
547(c)(1)'s requirement that the debtor and creditor intend a
contemporaneous exchange was necessarily met, as a matter of law.
That is, the Trustee does not directly challenge the bankruptcy
court's factual finding that Amherst intended the June 29 and
June 30 payments to be applied to prior transactions, but neither
does she accept that finding as dispositive of her argument.[2]

---

[2]     The Trustee would have the court recognize the relevant
exchange, not as the payment of old debt for the purpose of
reducing old debt, but as what one learned treatise aptly calls
the "reciprocal inducements" of "new value . . . [for] payment on
the old debt."  1 Epstein, et al.  Bankruptcy § 6-26 at 602
(1992).

As recognized by the court of appeals for this circuit, Congress intended the contemporaneous exchange defense to protect transactions which, although intended as contemporaneous exchanges, technically result in payment of antecedent debt.  See In re Lazarus, 478 F.3d 12, 19 (1st Cir. 2007).  A typical contemporaneous exchange transaction consists of a payment for goods by check.  See id. ("The contemporaneous test was added late in the day to address a much broader generic problem — ordinary exchange of goods for check or credit payment . . .). The appellate court explained:

> Section 547(c)(1) was aimed, as its legislative history shows, at a generic problem: those on the verge of bankruptcy still need to buy things (e.g., groceries or household items) and the fact that checks are used (with a brief gap between purchase and payment) ought not render the payment avoidable as one made for an antecedent debt.  H.R. Rep. No. 95-595, at 373 (1977).

Id. at 18.  See also Richard B. Levin, *An Introduction to the Trustee's Avoiding Powers*, 53 Am. Bankr. L.J. 173, 186 (1979) ("Though strictly speaking the transaction may be a credit transaction because the seller does not receive payment until the check is cleared through the debtor's bank, it is generally considered and intended to be a contemporaneous transaction . . .").

The contemporaneous exchange defense, generally speaking, protects transactions in which the debtor's transfer (i.e.

payment) is on account of what might be technically described as "antecedent debt," but debt that arises from the new value for which payment is being made.  Payments on already outstanding accounts receivable, that in turn trigger the extension of new credit with respect to new value generally cannot be claimed by a creditor to be a "contemporaneous exchange," beyond a Trustee's avoidance power.  In determining whether the transaction at issue here falls within the intended scope of § 547(c)(1), the bankruptcy court properly evaluated the parties' actual intent by looking at which debt(s) Amherst intended to, and did, pay. Notwithstanding some authority to the contrary, see e.g. In re Jannel Indus., Inc., 245 B.R. 757, 759-60 (Bankr. D. Mass. 2000), courts, as well as leading commentary in the field, generally support the bankruptcy court's approach here.  See, e.g., In re Dooley Plastics Co., 185 B.R. 389, 395 (Bankr. D. Mass. 1995); In re Pearson Indus., Inc., 142 B.R. 831, 846 (Bankr. C.D. Ill. 1992); 5 Collier on Bankruptcy ¶ 547.04[1][a], at 547-47 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2009).

A debtor who, as in this case, intends to pay old invoices and a creditor who accepts the debtors' payment and applies it to resolve old invoices, and then gives new value on a credit basis, certainly cannot be said to have "intended" a contemporaneous exchange as a matter of law, and will not, generally, succeed in preventing avoidance of the preferential payment by the debtor's

trustee under that defense.  That is not to say, of course, that under different factual circumstances, a court could not find, as a factual matter, that although the parties seemingly allocated a preferential payment to resolve outstanding invoices relative to antecedent debt, their actual intent, as a factual matter, was to contemporaneously exchange payments (however allocated) for goods.  But that was not the bankruptcy court's factual finding here, and its finding is supported by the evidence of record.

For these reasons, the bankruptcy court's factual conclusion that the transaction was not intended to be, and so was not, a contemporaneous exchange, is affirmed.

III. New Value as Actual Value of Goods Shipped

The Bankruptcy Code defines new value as "money or money's worth in goods, services, or new credit . . . ."  11 U.S.C. § 547(a)(2).  Whether something is new value presents a "question […] of fact."  In re Lewellyn & Co., 929 F.2d 424, 427 (8th Cir. 1991).  In this case, the bankruptcy court found that the products Avnet shipped on credit "in connection with the Honda Order" constituted "new value" under § 547(c)(4).  Doc. No. 5-1 at 16-17.  "Avnet provided new value every time it shipped computer components and software to Amherst and/or its customers during the preference period, an amount that the parties agree totals $7,019,112.33."  Id. at 17.  The court rejected the

Trustee's contention that the goods shipped under the 2 for 1
arrangement (which diminished the value of the estate) conferred
no net "material benefit" on the estate.  Instead, the court
accepted Avnet's position that a creditor "must simply provide
actual value, i.e., 'money's worth in goods, services, or new
credit.'"  Id. at 16.  The court held that "the Bankruptcy Code
contains 'no material benefit' test.  Rather, new value is
money's worth in goods, services, or new credit."  Id. at 17
(emphasis in original).  The Trustee appeals the bankruptcy
court's conclusion.

    The Trustee urges the court to look beyond the actual value
of the goods shipped and determine if the estate — on balance,
after considering all of the circumstances — was "benefitted."
But that approach seems unwarranted, at least in this case.  The
goods advanced on credit by Avnet benefitted the estate in the
ordinary sense that "money's worth" was provided to the estate.
There is no apparent reason to read more into the statutory
language beyond the requirement that new value be comprised of
money or money's worth in goods, services, or new credit.  See
H.R. Rep. No. 595, 95th Cong., 1st Sess. 177, 372 (1977) ("new
value" is to be "defined in [its] ordinary sense[…]").  The
bankruptcy court found that the actual value of the goods shipped
was established by the amount invoiced.  Doc. No. 5-1 at 17; Tr.
Ex. 108.  Accordingly, the bankruptcy court's factual

25

determination that $7 million worth of goods shipped to Amherst or its customers constituted new value is supported by the evidence of record, is not clearly erroneous, and is affirmed. The bankruptcy court's construction of the statutory term "new value" was correct.

### Conclusion

For the reasons set forth above, the decision of the bankruptcy court dated September 3, 2010, is affirmed.


**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

September 30, 2011

cc:  Olga L. Bogdanov, Esq.
     Taruna Garg, Esq.
     Geraldine L. Karonis, Esq.
     Dennis Meloro, Esq.
     Annapoorni Sankaran, Esq.
     Daniel W. Sklar, Esq.
     Mary F. Stewart, Esq.
     Peter N. Tamposi, Esq.
     Robert A. White, Esq.